1
2
3
4
5
6
7            IN THE UNITED STATES DISTRICT COURT
8             FOR THE DISTRICT OF ARIZONA
9
10   United States of America,              )
                                            )   CR 16-01350-TUC-CKJ(EJM)
11            Plaintiff,                     )
                                            )
12        vs.                                )   **REPORT AND RECOMMENDATION**
                                            )
13   Derek Lamont Terry,                     )
                                            )
14            Defendant.                     )
     _____)
15

16        Pending before the Court is the defendant Derek Lamont Terry's Motions to Suppress

17   evidence seized after an alleged illegal traffic stop and illegal arrest, specifically, the

18   statements he made to law enforcement and the evidence obtained from search of his cell

19   phone.  The defendant first contends that there was no reasonable suspicion for the traffic

20   stop, and therefore, all evidence that was seized as a result of that stop should be suppressed.

21   The defendant alternatively argues that even if there was reasonable suspicion for the traffic

22   stop, the stop ripened into an illegal arrest because of the length of his detention during the

23   stop, and all evidence stemming from the illegal arrest should be suppressed.  Finally, the

24   defendant argues that even if there was a reasonable suspicion for the stop and the extended

25   detention did not ripen into an illegal arrest, the statements he made to law enforcement after

26   his arrest should be suppressed because he invoked his right to counsel prior to making those

27   statements.  For the reasons discussed below, it is recommended that the District Court deny

28   the motions to suppress.

## FACTUAL AND PROCEDURAL BACKGROUND

**A. The Criminal Charges:**

The defendant was arrested on June 8, 2016, and charged in a criminal complaint with a violation of 18 U.S.C. § 2423(a) and (e), Transportation of a Minor to Engage in Prostitution. [Doc. 1.] The complaint describes the offense as follows. On June 8, 2016, an Arizona Highway Patrol Officer performed a traffic stop on a black 2016 Toyota four-door sedan on Interstate 10 near Milepost 304. The driver of the car was a female who did not have a valid driver's license. It was later discovered that the driver gave the patrol officer a false name, specifically, her sister's name. The passengers included the defendant and two other females. Eventually, the patrol officer was able to determine that one of the female passengers was a juvenile and that there was a "missing/runaway" juvenile alert for this female. The juvenile had initially told the officer that she was 19 years old and gave a false name. The juvenile begged the officer not to tell the others of her real identity. She further told officers that she met the defendant about two weeks ago and traveled with him and the females to and from California to Arizona to engage in prostitution. She stated that the defendant would take 50 percent of the money she made from prostitution.

On July 6, 2016, a federal grand jury in the District of Arizona returned a two-count indictment charging the defendant with Transportation of a Minor to Engage in Prostitution, in violation of 18 U.S.C. § 2423(a) and (e). [Doc. 23.] On August 17, 2016, a Superseding Indictment was returned which added a third offense, Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1) and (b)(1). [Doc. 55.] On February 8, 2017, a Second Superseding Indictment was returned adding the additional offenses of Conspiracy to Commit Transportation of a Minor to Engage in Prostitution, in violation of 18 U.S.C. § 2423(e), and Sex Trafficking of Children, in violation of 18 U.S.C. §§ 1591(a)(1), (a)(2), and 1594(a). [Doc. 193.]

**B. The Motions to Suppress and Evidentiary Hearing:**

Defendant Terry filed a Motion to Suppress Evidence on October 11, 2016. [Doc. 103.] In that motion, the defendant first argues that both the statements he made to law

enforcement officers after his arrest and the results of the search of his cell phone should be suppressed because the length of his detention, which began as a result of a traffic stop, ripened into an illegal arrest. The defendant also argues that his statements made to law enforcement should be suppressed because he invoked his right to counsel before questioning. On October 31, 2016, the co-defendant filed a Motion to Suppress Evidence seized as a result of an illegal traffic stop – *i.e.*, a stop conducted without reasonable suspicion. [Doc. 125.] Defendant Terry joined in that motion on November 15, 2016, and again seeks suppression of his statements and the results of the search of his cell phone. [Doc. 153.]

The government argues that there was reasonable suspicion for the traffic stop, specifically, the driver of the vehicle committed the traffic infraction of "following too closely." The government also argues that the detention of the defendant during that stop did not amount to an illegal arrest because the length of detention resulted from the fact no one in the car had a valid driver's license and no one had the rental contract for the vehicle which was not rented by any of the car's occupants. Finally, the government argues that the defendant never invoked his right to counsel; rather, after being advised of his Miranda rights, the defendant knowingly and voluntarily agreed to speak with law enforcement officers.

On April 4, 2017, this Court held an evidentiary hearing on the Motion to Suppress. The government called the following witnesses: (1) Trooper Keith Duckett; (2) Detective Marcus Anderson; and (3) Sergeant Joshua Wilhelm. The defense called two witnesses: (1) Dana Glenn, the co-defendant in this case; and (2) the defendant, Derek Lamont Terry.

**1. Testimony of the government witnesses:**

**a. Trooper Keith Duckett:**

Mr. Duckett testified that he is a patrol officer with the Arizona Department of Public Safety, assigned to the K9 Criminal Interdiction Unit. (4/4/17 Tr. at 12.)[1] He has worked

---

[1] Citations to "4/4/17 Tr." followed by the page number are to the transcript of the evidentiary hearing on the motions to suppress.

with the Department of Public Safety for over 25 years, after deciding that law enforcement suited him better than engineering. (*Id*. at 12, 46.) Trooper Duckett testified that his patrol car has a dashboard camera which is automatically activated when he turns on his emergency lights. (*Id*. at 15-16.) He also testified that he wears a small body camera which is attached to the front of his uniform. (*Id*. at 14.) Both cameras record video and audio.[2]

On June 8, 2016, Trooper Duckett was patrolling in Cochise County on Interstate 10 near Milepost 306. (*Id*. at 16.) At about 7:20 a.m. that day as he was monitoring traffic in a construction zone area, he observed a black Toyota Camry that was following a commercial vehicle too closely. (*Id*. at 16-17.) The speed limit in the construction zone is 45 miles per hour. (*Id*. at 16.) Although the Toyota was not exceeding the speed limit, he estimated that this vehicle was one second behind the commercial vehicle (*i.e.*, a large semi-truck) that the Toyota was following. (*Id*. at 17, 48.) Trooper Duckett felt that this was an unsafe driving distance so he decided to perform a traffic stop on the Toyota. (*Id*. at 17.) Trooper Duckett activated his emergency lights, which triggered his dashboard camera to activate, and eventually positioned his patrol car behind the Toyota. (*Id*. at 17, 20.) The driver of the Toyota pulled over to the side of the road without incident. (*Id*. at 17.)

Trooper Duckett exited his patrol car and proceeded to the passenger side of the Toyota. (*Id*. at 18.) When he arrived, he saw four people in the Toyota - a female driver, the defendant in the front passenger seat, and two females in the back seat. (*Id*.) Trooper Duckett testified that when the Toyota first passed by his location on I-10, he only saw a person in the driver's seat of the Toyota. (*Id*. at 17, 19.) Trooper Duckett explained to the driver that she was pulled over because she was following the semi-truck in front of her too closely and asked the driver for her license. (*Id*. at 20; Ex. 19 at 2.)

At about this point in Trooper Duckett's testimony, the government introduced into evidence and played for the Court Trooper Duckett's body camera footage. That video footage and the audio recording, as well as Trooper Duckett's testimony about the video and

_____

[2] Citations to "Ex. 9" and "Ex. 19" are to the transcript of the audio of Trooper Duckett's body camera.

audio, shows the following. The driver stated that she did not have her driver's license with her because she lost her wallet, but that she did have a valid license. (Ex. 19 at 2, 5.) He asked the driver to accompany him to his patrol car while he attempted to find her license information on his computer. (*Id*. at 2-3.) The driver told the officer that her name was Thomalisha Glenn and that she had a California driver's license. (*Id*. at 5-7.) She could not remember her Social Security number. (*Id*. at 9.) It took a good deal of time for Trooper Duckett to locate the license information in his computer system. (*Id*. at 8-25.) But when he did locate the license information, it showed that the driver's license had expired. (*Id*. at 25.)

Trooper Duckett asked if anyone else in the vehicle had a license or identification. (*Id*. at 4-5.) The defendant had a driver's license but it was suspended. (4/4/17 Tr. at 35, 51; Ex. 9 at 8.) Neither female in the back seat had identification; one of the females (Jade) stated that she did not have a driver's license and the other female's license was suspended. (Ex. 19 at 5, 16, 23.) When he asked about the car's registration documents, the defendant told Trooper Duckett the car was a rental and no one had the rental contract. (*Id*. at 3-4, 12, 27.) The defendant also told Trooper Duckett that his mother-in-law had rented the car for him. (*Id*. at 3.) The defendant told Trooper Duckett that he could search the car for documents. (*Id*. at 27-28.) The search revealed a hotel bill from San Bernardino, California in the name of Dana Glenn, who the driver claimed was her sister. (Ex. 9 at 2, 10-12.) The hotel bill reflected that the person who rented the room checked in and checked out of the hotel the same day. (4/4/17 Tr. at 32.)

Trooper Duckett proceeded to question the car's occupants about where they were coming from, where they were going, their identities, and how they knew each other. (Ex. 19 at 4-5, 10, 15-19, 28-30.) Trooper Duckett got conflicting information as to all subject areas. (4/4/17 Tr. at 28; Ex. 19 at 19-21.) For instance, the defendant said they were driving back to California from El Paso where they were partying over the weekend with friends he had there, and they stayed in a hotel near the airport. (Ex. 19 at 4, 15.) The driver of the vehicle, Ms. Glenn, said that they went to El Paso for a funeral, and they all stayed with her

"aunty." (*Id*. at 6, 11.) The driver only knew the other two females by nicknames. (*Id*. at 10.) Finally, the female named Jade said that she met the defendant and the two females in Texas, while others implied that they had all traveled together from California. (Ex. 19 at 29; Ex. 9 at 3.)

This conflicting information, the absence of a rental contract for the car, and the fact that no one had a valid driver's license (and the females had no identification) was concerning to Trooper Duckett. (4/4/17 Tr. at 28-29.) He became suspicious that the females were engaging in prostitution based on this information, as well as the way the females were dressed, the fact that they only knew each other by nicknames, and the absence of any luggage or belongings that was indicative of a road trip between California to Texas. (Ex. 9 at 2-3, 14, 20; Ex. 19 at 10; 4/4/17 Tr. at 28-30.) While Trooper Duckett was attempting to find out the true identities of the four people and whether they had driver's licenses or warrants, another officer questioned the female named Jade to see if she was being forced to prostitute, and expressed concern for her safety. (Ex. 9 at 11; Ex. 19 at 28-32; 4/4/17 Tr. at 36.) Jade appeared nervous to the officers and almost began to cry, but she maintained she was an adult and was not a prostitute. (Ex. 19 at 30; Ex. 9 at 21-23; 4/4/17 Tr. at 34-35, 57-58.)

Notwithstanding his suspicion about sex trafficking, Trooper Duckett continued to work on what to do with these four people and this vehicle given that no one could legally drive and no one could prove that they had permission to use the rental car. Trooper Duckett testified that if one of the four people had a license and the rental car company confirmed that one of these people was authorized to drive the rental car, he would have let the licensed driver drive the vehicle to California. (4/4/17 Tr. at 43-44.) However, ultimately, because no one had a license or could produce a rental contract for the car, Trooper Duckett decided that other officers would take the four people to a truck stop where there is a hotel, and the car would be towed per the rental company's direction. (Ex. 9 at 14-18; 4/4/17 Tr. at 35.) Trooper Duckett issued a warning to the driver for following too closely and for driving without a valid license. (4/4/17 Tr. at 52-53, 56; Ex. 3.)

While Trooper Duckett was waiting for the tow truck, he did some additional research to see if he could find out information about the female named Jade. (4/4/17 Tr. at 36-37.) He received information about a runaway juvenile from California with the same last name that Jade had provided to the officers. (*Id*. at 37.) Also, the height and weight of the runaway matched the person known as Jade. (*Id*.) As such, Trooper Duckett was confident that Jade was this runaway juvenile, and he was convinced that she was involved in sex trafficking. (*Id*.) Trooper Duckett radioed for other officers to respond to the truck stop where the defendant, Jade and the other two females had been dropped off minutes earlier. (*Id*. at 38.)

Trooper Duckett arrived at the truck stop at about the same time as the other officers. (*Id*.) Trooper Duckett took Jade aside to talk with her and told her that he knew her real name and that she was a runaway juvenile. (*Id*. at 39.) Jade became upset and told Trooper Duckett that he had to arrest her, put her in his patrol car, and tell the other three people that she had a warrant. (*Id*.) Based on his experience, Trooper Duckett concluded that Jade was scared and had been intimidated and brainwashed. (*Id*. at 40.)

Trooper Duckett went over to the defendant and the other two females and told them they were going to be transported to the DPS office in Sierra Vista because they were with a runaway juvenile that had been transported across state lines and further investigation needed to be done. (*Id*.) The defendant and the two females were cooperative and no one requested an attorney. (*Id.* at 40-41.) Trooper Duckett drove Jade to the Sierra Vista office so she could be interviewed by a detective. During the trip, he made idle conversation with Jade but did not talk about the investigation. (*Id*. at 42.) Trooper Duckett was not involved in the interviews of the defendant, Jade or the two females at the Sierra Vista office. (*Id*.)

On cross-examination, Trooper Duckett reiterated his suspicions about sex trafficking and that Jade was a juvenile. (*Id*. at 51, 55.) He also testified that he believes that he saved the juvenile's life. (*Id*. at 56.)

**b. Detective Marcus Anderson:**

Mr. Anderson has been a detective with the Arizona Department of Public Safety for

the past year. (4/4/17 Tr. at 61.) Prior to joining DPS, he was a detective with the Sierra Vista Police Department for six years. (*Id*.) On June 8, 2016, Detective Anderson was asked by his supervisor to assist the Arizona Highway Patrol on a possible prostitution case. At about 9:40 a.m. that day, he met with some of the Highway Patrol Officers involved in the arrests at issue and was briefed on the traffic stop and the suspicion that officers had a juvenile involved in prostitution. (*Id*. at 62-63.) After ensuring that the juvenile, the defendant, and the other two females were separated, Detective Anderson asked another detective to interview the juvenile while Detective Anderson interviewed the defendant. (*Id*. at 63-64.)

The interview of the defendant took place in Detective Anderson's office, and the defendant was handcuffed during the interview. (*Id*. at 65.) The interview started by Detective Anderson explaining to the defendant that he was not free to leave and, for that reason, Detective Anderson was going to advise the defendant of his rights. (*Id*. at 66.) Detective Anderson testified that he pulled out his Miranda warning card and read it to the defendant. (*Id*.) The defendant stated that he understood his rights and said he was willing to talk "as long as I'm not being arrested." (*Id*. at 67.) Detective Anderson was never told by the patrol officers that the defendant had previously requested counsel. (*Id*. at 72.) Detective Anderson described the conversation with the defendant as "casual" and "conversational" and the tone of the interview never changed. (*Id*. at 67, 73.) Detective Anderson spoke with the defendant for between 45 minutes and an hour before they took a break so Detective Anderson could determine where the other detectives were at with their interviews.[3] (*Id*. at 74.)

Detective Anderson spoke with the juvenile along with another officer, and also did some internet research which revealed "Backpage" ads (for prostitution) with photos of the juvenile. (*Id*. at 74-75.) Detective Anderson then went back to interview the defendant and

---

[3] This entire interview was audio recorded. (*Id*. at 66, 86.)

was more confrontational in reference to the juvenile.[4]  (*Id.* at 76.)  Specifically, he told the defendant that the juvenile was not 19, but rather 16 years old.  (*Id.*)  The defendant said that he took the juvenile from a "gorilla pimp" and that he treats women differently and believes they should earn a good living from prostitution.  (*Id.* at 77.)  The defendant also intimated that he had "worked with" a hundred prostitutes.  (*Id.*)  The defendant said that he could cooperate with law enforcement and provide information.  (*Id.* at 78.)  In fact, the defendant provided the pass code for his cell phone.[5]  (*Id.*)

During both interviews, the defendant never invoked his right to counsel, never asked to end the interview, and never said that he told another officer that he did not want to talk without an attorney present.  (*Id.* at 79, 84.)  In fact, the defendant said that if he had anything to hide, he would have already asked for a lawyer.  (*Id.* at 80.)

### c. Sergeant Joshua Wilhelm:

Mr. Wilhelm is a Sergeant with the Arizona Department of Public Safety.  (4/4/17 Tr. at 88.)  On June 8, 2016, he was working traffic enforcement in the Cochise County area.  (*Id.*)  On that day, he provided assistance to Trooper Duckett who had made a traffic stop on a vehicle that had four occupants (three female and one male).  (*Id.* at 89.)  While at the location of the traffic stop, Sergeant Wilhelm did not hear any of these four people invoke their right to counsel.  (*Id.* at 90.)  Sergeant Wilhelm was tasked with giving two of the females a ride to a truck stop.  (*Id.* at 89-90.)  After he dropped off the two females, he went back to his traffic patrol duties.  (*Id.* at 90, 93.)

However, within about five minutes, he returned to the truck stop at the request of Trooper Duckett.  (*Id.* at 90, 92-93.)  Sergeant Galarneau and Trooper Duckett also went to the truck stop.  (*Id.* at 90-91.)  Trooper Duckett advised Sergeant Wilhelm that one of the females was a runaway juvenile, and Trooper Duckett removed the juvenile from the other

---

[4] Only four minutes of this interview were recorded because the batteries in Detective Anderson's tape recorder ran out of charge.  (*Id.* at 83, 85-86.)

[5] Detective Anderson put the phone on "airplane mode" so it could not be remotely wiped.  (*Id.* at 84, 87.)  A search warrant was later obtained for the phone.  (*Id.*)

three individuals. (*Id*. at 91.) Sergeant Wilhelm spoke briefly with the other three individuals and transported the defendant to the DPS station in Sierra Vista. (*Id*.) Sergeant Wilhelm secured the defendant in a separate area from the females. (*Id*. at 92.) He never interviewed the defendant or was present for an interview. (*Id*.) During the drive to the station, as well as during any interaction that Sergeant Wilhelm had with the defendant, he never stated that he wanted to have an attorney prior to any questioning. (*Id*. at 91-92.)

## 2. Testimony of the defense witnesses:

### a. Dana Renaye Glenn:

Ms. Glenn testified that on June 8, 2016, she was pulled over by law enforcement for a traffic infraction. (*Id*. at 98-99.) She testified that while driving on Interstate 10, she noticed a construction zone and slowed down because the speed limit was 45 miles per hour. (*Id*.) She recalls that there was a "big semi truck" in front of her as she was driving through the construction zone. (*Id*. at 100.) She testified that her vehicle was two car lengths behind the truck as they proceeded through the construction zone. (*Id*.) She testified that she was being careful as she drove through the construction zone because she "had three lives in [her] hands."

On cross-examination, Ms. Glenn admitted that she has never had a driver's license or taken a road test or driving course. (*Id*. at 101.) She also testified that she lied to Trooper Duckett when she gave her name as Thomalisha Glenn, which is her sister. (*Id*. at 102.) Ms. Glenn testified that she could not recall what direction she was traveling on June 8, 2016. (*Id.* at 98.) She testified that she has two children with the defendant and has lived with him for the past five years. (*Id*. at 103.) She also testified that she has had many phone conversations (more than she can count) with the defendant while they have both been in custody. (*Id*. at 106.) These calls were facilitated using a third-party who is not in custody, even though the prison prohibits these "three way" phone calls. (*Id*. at 107-108.) Ms. Glenn admitted that she discussed the facts of the pending case with the defendant during the numerous phone calls. (*Id*. at 108.)

**b. Derek Lamont Terry:**

Mr. Terry's testimony was initially focused on what occurred at the truck stop after the officers had transported him and the females from the scene of the traffic stop to the truck stop. He testified that after the officers dropped him off at the truck stop, he went inside to use the restroom and bought a pack of cigarettes. (*Id*. at 111.) He estimates that the officers came back to the truck stop within ten to fifteen minutes. (*Id*.) Mr. Terry testified that he and the three females were standing together smoking cigarettes when three patrol cars arrived and essentially surrounded them. (*Id*. at 113-114.) He testified that Trooper Duckett got out of his car and grabbed Jade (the juvenile) and walk her to Trooper Duckett's patrol car. (*Id*. at 114.) Sergeant Galarneau grabbed Dana (Glenn) and told them all that they were being detained for questioning. (*Id*.) Mr. Terry testified that he told Sergeant Wilhelm: "I don't want to be questioned, I want a lawyer." (*Id*.) According to Mr. Terry, Sergeant Wilhelm did not respond. (*Id*.) The defendant testified that the other two females also asked for an attorney. (*Id*. at 118.)[6]

Mr. Terry was then placed in handcuffs and put into a patrol car. (*Id*. at 114-115.) He reached into his pocket to get his phone and called "[o]ne of the mothers of my kids" - the one whose mother had rented the car for him. (*Id*. at 115.) He told her that he was being detained for questioning and that he told officers that he wanted a lawyer. (*Id*.) When Sergeant Wilhelm saw that the defendant was on the phone, he took the phone from the defendant. (*Id*.) Sergeant Wilhelm then took the defendant to the Sierra Vista police station and placed him in an office. (*Id*. at 116.)

Detective Anderson then came into the office and told the defendant that he was not free to leave and read the defendant his rights. (*Id*.) Mr. Terry testified that he told Detective Anderson that he understood his rights and that he would speak with Detective Anderson "[o]nly if I'm not being arrested." (*Id*. at 116-117.) Mr. Terry said that Detective Anderson

---

[6] On cross-examination, the defendant admitted that he has had many phone calls with Ms. Glenn while they have both been in custody and that they have talked about "this issue" - the request for counsel. (*Id*. at 119-120.)

never responded to that statement. (*Id*. at 117.)  In response to defense counsel's question as to why Mr. Terry answered questions after being advised of his rights, the defendant testified that "[b]ecause I didn't feel like I was doing anything wrong." (*Id*. at 117.)  The defendant testified that he had requested counsel earlier, "but that wasn't honored" so he felt like he had to answer Detective Anderson's questions. (*Id*.)

## DISCUSSION

### A.    The Traffic Stop

"[A] police officer may conduct an investigatory traffic stop if the officer has 'reasonable suspicion' that a particular person 'has committed, is committing, or is about to commit a crime.'" *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) *(quoting United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000).  "Reasonable suspicion is formed by 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'"  *United States v. Mariscal*, 285 F.3d 1127, 1130 (9th Cir. 2002) (*quoting Lopez-Soto*, 205 F.3d at 1105.).

"A traffic violation alone is sufficient to establish reasonable suspicion." *Choudhry*, 461 F.3d at 1100.  Moreover, the United States Supreme Court has rejected the argument "that the standard should be different where 'civil traffic regulations' are concerned." *Id*. at 1100-1101 (citing *Whren*, 517 U.S. 806 (1996) and *United States v. Willis*, 431 F.3d 709, 715).  In *Whren*, the Supreme Court held that a civil traffic violation was sufficient to justify an investigatory stop regardless of whether: (1) the violation was merely pretextual; (2) the stop departed from the regular practice of a particular law enforcement agency; or (3) the violation was common or insignificant.  517 U.S. at 818-819.  Thus, here, as long as Trooper Duckett had reasonable suspicion to believe that the driver of the Toyota "'violated the traffic code,' the stop was 'reasonable under the Fourth Amendment and the evidence thereby discovered admissible.'" *Choudhry*, 461 F.3d at 1102 (*quoting Whren*, 517 U.S. at 819.).

The testimony presented at the evidentiary hearing clearly establishes that Trooper Duckett had reasonable suspicion that the driver of the Toyota had violated the traffic code

by following the vehicle in front of her too closely.  Trooper Duckett testified that he positioned his patrol vehicle in the construction zone near mile marker 306 on Interstate 10 because the speed limit drops to 45 miles per hour. (4/4/17 Tr. at 16-17.)  While the driver of the Toyota was not speeding, Trooper Duckett observed that the vehicle was only one second behind a semi-truck. (*Id*. at 17.)  He testified that a safe distance is 4 to 5 seconds. (*Id*.)  Based on this traffic infraction, he initiated a traffic stop on the Toyota.

The only other testimony regarding the "following too closely" traffic infraction came from Ms. Glenn, the driver of the Toyota.  She testified that she was not speeding and was two car lengths behind the semi-truck in front of her car. (*Id*. at 100.)  She further testified that she was being careful while driving through the construction zone because she had three lives in her hands. (*Id*.)  However, on cross-examination, Ms. Glenn conceded that she has never had a driver's license or taken a road test or driving course. (*Id*. at 101.)  She also admitted that she lied to Trooper Duckett about her true name, presumably because she does not have a driver's license. (*Id*. at 102.)  Finally, she conceded that she has spoken with the defendant many times about the facts of the instant case via "three way" phone calls that are prohibited by the detention facility. (*Id*. at 107-108.)

The Court finds Trooper Duckett's testimony about the driving behavior that he observed and why he initiated  a traffic stop to be credible.  Trooper Duckett's job is to look for traffic infractions, and he positioned his patrol car in the construction zone to do so.  He was positioned perpendicular to Interstate 10 so he had a perfect view as to how closely vehicles were following one another through the construction zone. (*Id.* at 19.)  It is fair to conclude that Trooper Duckett, who knows the traffic laws and was focused solely on driving behavior in this construction zone, is the best person to assess how closely one car is traveling behind a semi-truck.  By contrast, a driver's focus on the traffic laws (to the extent they even know them) is often distracted by many things; some are associated with driving, like other vehicles on the road and entering a construction zone, and others that have nothing to do with driving, such as the scenery, conversations with passengers, and cell phones.

Trooper Duckett was clearly looking for traffic infractions in that construction zone

(since that is his job), but there was no evidence presented that he made up the infraction so he could stop Ms. Glenn's vehicle. The defense did suggest in its pleading that the reason for the traffic stop was pretextual - because Ms. Glenn is an African-American female. However, the defense presented no evidence at the hearing to support an argument that the traffic stop was pretextual. Moreover, as noted by the Supreme Court in *Whren*, a traffic infraction is sufficient to justify an investigatory stop even if the stop was pretextual. 517 U.S. at 818-819; *see also Mariscal*, 285 F.3d at 1130 (the subjective motives of the officer does not invalidate an otherwise proper stop because all that is required is an objectively reasonable basis for the stop).[7] That said, the Court finds no evidence that this traffic stop was in fact pretextual.

Finally, the Court finds Ms. Glenn's testimony about her driving behavior to be incredible for the following reasons. First, when she was pulled over and was told by Trooper Duckett that he stopped her for "following too closely," she did not claim that she was two car lengths behind the semi-truck or otherwise dispute why she was stopped. Generally speaking, if a driver is pulled over for an alleged traffic infraction (whether it be speeding or following too closely) and disagrees with the officer's claim about why s/he was stopped, it is only natural for the driver to give his/her side of the story. That did not happen here, and Ms. Glenn had ample opportunity during the traffic stop to tell her side of the story.

Second, while Ms. Glenn likely was cognizant of the reduced speed limit in the construction zone, especially since she saw another DPS officer prior to entering the construction zone, it is unlikely she was concerned about following the vehicle in front of her too closely for the following reasons. (Ex. 19 at 25.) Following too closely is a relatively minor civil traffic infraction (even though that driving behavior could cause an accident) and a large percentage of motorists likely commit this traffic infraction every day without much

_____

[7] As the Supreme Court in *Whren* also noted, even if Trooper Duckett's stop departed from the regular practice of the Arizona Department of Public Safety and/or the traffic infraction was common or insignificant, the traffic stop was still lawful if based on a traffic violation. 517 U.S. at 818-819. Again, the defense presented no evidence on either of these points.

concern about being pulled over for this driving behavior. Thus, when Ms. Glenn noticed Trooper Duckett in the construction zone, it is reasonable to conclude that the speed she was driving, and not her distance behind the semi-truck, was her main focus and concern.

Third, Ms. Glenn was traveling at a greatly reduced speed in the construction zone (from the 75 miles per hour speed limit in other parts of Interstate 10) so any concern about being able to timely brake her vehicle was likely reduced as well. Indeed, that fact may have played into Trooper Duckett's decision to only issue her a warning and not a ticket.

Finally, Ms. Glenn's credibility is also undercut by the following facts: (1) she has never had a driver's license; (2) she has never taken a road test or driving course where she would learn what is a safe distance between vehicles; (3) she gave Trooper Duckett a false name so he would not find out she did not have a driver's license; (4) she testified that she could not recall what direction she was traveling on June 8, 2016; and (5) she admitted that she has spoken with the defendant – in a manner that violates prison policy – more times than she can count about the pending case. (4/4/17 Tr. at 98, 101-102, 106-108.)

All of the facts set forth above undercut Ms. Glenn's testimony that she was two car lengths behind the semi-truck when she passed by Trooper Duckett. As such, the Court concludes that Trooper Duckett's credible testimony about Ms. Glenn's driving behavior provided a reasonable suspicion to stop her vehicle for a traffic infraction. Therefore, it is recommended that the motion to suppress on this basis be denied.

**B.**     **The Duration of the Traffic Stop**

    **1. Law enforcement officers did not prolong the traffic stop.**

The Supreme Court has held that "[a] seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015). The Court held that a traffic stop is more like a *Terry* stop than a formal arrest. *Rodriguez*, 135 S.Ct. at 1614.

> Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' - to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate that purpose.' Authority for the seizure

thus ends when tasks tied to the traffic infraction are - or reasonably should have been - completed.

*Id.* (internal citations and quotations omitted). As such, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (the seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop.").

However, the Supreme Court has recognized that "[t]raffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 135 S.Ct. at 1616 (internal quotation and citation omitted).[8] As such, an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop." *Id.* at 1615. For example, in addition to deciding whether to issue a traffic citation, "an officer's mission includes ordinary inquiries incident to the traffic stop," such as checking the driver's license, determining if there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance. *Id.* (internal citation and quotation omitted). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* Additionally, courts have made clear that "mere police questioning does not constitute a seizure unless it prolongs the detention of the individual, and, thus, no reasonable suspicion is required to justify questioning that does not prolong the stop." *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) (*citing Muehler v. Mena*, 544 U.S. 93, 101 (2005)); *see also United States v. Turvin*, 517 F.3d 1097 (9th Cir. 2008) (no reasonable suspicion needed to justify questioning that does prolong an initially lawful stop).

In the case at hand, the Court finds that neither Trooper Duckett nor any of the other officers at the scene of the traffic stop prolonged that stop beyond the time reasonably required to complete the mission of issuing warning tickets to Ms. Glenn. The officers'

---

[8] The "officer safety interest stems from the mission of the stop itself," and not from the "on-scene investigation into other crimes detours from that mission." *Id.*

actions were aimed at: (1) addressing the traffic infraction that was the purpose of the stop, following too closely; (2) addressing another traffic infraction discovered after the vehicle was stopped, driving without a license; and (3) attending to related safety concerns. The actions of these officers lasted no longer than necessary to effectuate the purpose of the stop and the traffic violations.

There is no dispute that the duration of this traffic stop was lengthy - it took around 45 minutes before the vehicle's occupants were dropped off at the truck stop. But there is no "hard and fast limit" for gauging the reasonableness of the length of detention. *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (no rigid time limitation on *Terry* stops as the inquiry must focus on the law enforcement purposes to be served by the stop and the time reasonably necessary to effectuate those purposes); *United States v. Mayo*, 394 F.3d 1271, 1275-1276 (9th Cir. 2005) (40-minute *Terry* detention was not unreasonable because officers pursued multiple inquiries promptly as they arose). Moreover, as discussed below, the occupants of the vehicle extended the duration of the traffic stop, not the law enforcement officers. *See Sharpe*, 470 U.S. at 688 (length of stop not unreasonable where officers acted diligently and suspect's actions contributed to the delay about which he complains).

The first delay occurred because Ms. Glenn told Trooper Duckett that she did not have her driver's license with her, but claimed she did have a valid license. (Ex. 19 at 2, 5.) That claim required Trooper Duckett to conduct manual computer searches, which are time-consuming, to find out if Ms. Glenn (who had given a false name) did have a valid driver's license out of California. (4/4/17 Tr. at 34.) Ms. Glenn's inability to recall her social security number (assuming she would have given him her social security number and not her sister's) added time to that computer search. The body camera video and audio demonstrate that Trooper Duckett was working diligently in trying to locate Ms. Glenn's license information, but it did take some time to find it.

The next delay arose from the fact that Ms. Glenn's purported license (which was actually her sister's) was expired. (Ex. 19 at 25.) Trooper Duckett could not let Ms. Glenn drive without a valid license, so he had to inquire and check into whether anyone else in the

car had a valid license. The defendant told Trooper Duckett that he had a license, but he said it had been suspended. (4/4/17 Tr. at 51.) Neither female in the backseat had identification; Jade claimed she did not have a license and the other female's license was suspended. (Ex. 19 at 5, 16, 23, 27; Ex. 9 at 16, 18.) Trooper Duckett needed to confirm this information by attempting to run the names that he was given through the computer system in his car. (4/4/17 Tr. at 28.) Again, that took some time.

Further delay resulted from the fact that no one had the rental contract or registration for the car. Thus, no one in the car could prove that they had rented the car and/or was an authorized driver on the rental contract. The defendant added to this delay by presenting his story about who rented the car, who was authorized to drive it, and offering to call the person who allegedly rented it.[9] (Ex. 19 at 3.) In fact, the traffic stop would have been even longer if the officers had taken the defendant up on his offer to call the person who allegedly rented the car.

Additional delay resulted from the consent search of the vehicle in an attempt to locate a rental contract, information about the rental car, and/or identification documents. The inability to find a rental contract required the officers to call the rental company and find out who rented the car and who was authorized to drive the car. Again, that took some time. After confirming that none of these four individuals rented the car or were authorized drivers, the officers had to arrange for the car to be towed.

Trooper Duckett testified that if any one of these four people had a valid license and was listed as an authorized driver on the rental contract, he would have let that person drive the car once he issued the citation or warning to Ms. Glenn. (4/4/17 Tr. at 43-44.) But he simply could not let someone drive a vehicle if s/he did not have a valid license. (*Id*. at 43-44, 52) Moreover, even if someone had a valid license, Trooper Duckett could not lawfully let that person drive the car unless they were an authorized driver on the rental contract. (*Id*.

---

[9] The defendant further delayed the traffic stop by initiating a conversation with the officers about the females in the backseat, specifically, that they are a little young. (Ex. 9 at 4.) Trooper Duckett testified that he felt like the defendant was trying to "talk his way out" of the situation. (4/4/17 at 33; Ex. 9 at 4-10.)

at 44.)  As such, he had to call for assistance from other officers to ultimately transport these four people to a safe place, rather than leave them on the side of the road.  (Ex. 9 at 14, 18.) That call for assistance caused some additional, but reasonable, delay.  In short, every action that Trooper Duckett took during the traffic stop served "the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 135 S.Ct. at 1615.  Morever, his actions also ensured the safety of the car's occupants.

To be sure, Trooper Duckett appeared frustrated with the time this traffic stop was taking because he did not know what to do with these folks given that no one had a valid driver's license and no one was authorized to drive the rental car.[10]  (Ex. 9 at 7, 11, 14; Ex. 19 at 13, 16, 21.)  But, again, the delay in deciding what to do with these four people was not caused by anything that Trooper Duckett did during the traffic stop.  He played the hand he was dealt in this unusual traffic stop where no one had a license or could legally drive the rental car.  Stated another way, he did his job in terms of the computer checks that were done regarding driver's licenses and the phone call that was made about the rental car, as well as in making sure that these four people got to a safe place.  That job simply took some time given the unusual circumstance of this traffic stop.

There is no dispute that both Trooper Duckett and Sergeant Wilhelm thought that the females were prostitutes and suspected that Jade may be a juvenile. For that reason, both Trooper Duckett and Sergeant Wilhelm questioned Jade to find out if she was a juvenile and being forced to prostitute.   However, this questioning did not prolong the traffic stop. Trooper Duckett's questioning of Jade was brief and it included obtaining biographical information so he could run a computer check to verify her identity, including whether she had a driver's license. (Ex. 19 at 16-17, 28-32.)  While Sergeant Wilhelm was questioning Jade, Trooper Duckett was performing duties related to the traffic stop, *e.g*., running records

---

[10]  Trooper Duckett is heard on the audio of his body camera saying the following: "I got to find somebody who has a driver's license here" (Ex. 19 at 16), and "I don't know what to do here, though.  Nobody's got a driver's license.  And I can't even find her [Ms. Glenn] in the system." (Ex. 19 at 21)

checks, looking for a rental contract, and obtaining contact information for the rental company. (4/4/17 Tr. at 26, 32-34.) Thus, neither Trooper Duckett's nor Sergeant Wilhelm's questioning of Jade prolonged this traffic stop.

In conclusion, the duration of this traffic stop was related to and reasonable in light of the seizure's "mission" - to address the traffic violation that warranted the stop, to address the additional traffic violation discovered after the vehicle was stopped, and to attend to related safety concerns of both officers and the car's occupants. Moreover, the prolonged nature of the stop was not caused by the law enforcement officers' actions. Rather, the duration of the stop was caused by the actions of and information provided by each and every person in the vehicle, and the necessary tasks that the officers had to perform as a result of those actions and information. For these reasons, this Court finds that traffic stop was lawful because it not was prolonged beyond the time reasonably required to complete the mission of issuing traffic citations. Accordingly, it is recommended that the motion to suppress on this ground be denied.

### 2. The prolonged stop was also justified by the reasonable suspicion of criminal activity besides the traffic infractions.

"[A]n officer may [lawfully] prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion." *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015). As discussed above, the Court concludes that the officers' actions did not prolong this traffic stop so as to make the stop last longer than necessary to effectuate its purpose. However, the Court also concludes that the officers had a reasonable suspicion of prostitution or sex trafficking which justified prolonging the traffic stop beyond the time necessary to deal with the traffic infractions.

Both Trooper Duckett and Sergeant Wilhelm suspected, rather quickly, that the females were prostitutes. (4/4/17 Tr. at 34-35, 51, 55; Ex. 9 at 3.) Their initial suspicions were based on the following information obtained within minutes of the traffic stop: (1) none of the females had identification (or purses), which the officers testified was unusual (especially for the driver) for a long road trip between California and Texas. (Ex. 19 at 27-28.); (2) no one in the vehicle had rented it or had a rental contract or valid driver's license

(4/4/17 Tr. at 28; Ex. 9 at 7-8; Ex. 19 at 3, 27.); (3) the females only knew each other by their nicknames, which Trooper Duckett testified was indicative of a criminal enterprise where the participants conceal their true names from each other (4/4/17 Tr. at 29; Ex. 9 at 3; Ex. 19 at 10.); (4) Ms. Glenn did not know her Social Security number, which seemed odd to Trooper Duckett  (4/4/17 Tr. at 29; Ex. 19 at 9.); (5) the females were not wearing comfortable travel clothes for a long road trip; and (6) the inconsistent statements from the defendant and Ms. Glenn about why they went to Texas (to party or attend a funeral) and where they stayed while in Texas (in a hotel near the airport or at Ms. Glenn's aunt's house). (Ex. 9 at 4-7; Ex. 19 at 4-6, 11, 15.)

The officer's suspicions of prostitution increased after the consent search of the vehicle for the rental contract and/or identification documents revealed the following.  First, there was a small amount of luggage for a lengthy road trip, including the lack of any clothing that would normally be worn to a funeral (which Ms. Glenn claimed she had attended).  (4/4/17 Tr. at 30.)  Second, the bill (in the name Dana Glenn) from a hotel in California in a city near where some of these folks allegedly lived, which reflected that the person renting the room checked in and checked out of the hotel on the same day.  (4/4/17 Tr. at 31-32.)  Trooper Duckett testified that prostitutes often rent hotel rooms in the city they live because they do not want to take customers to their homes.  (*Id.*)

The officer's suspicion that Jade was a juvenile involved in sex trafficking was based on the following facts: (1) officers could not find an identification record for the name provided by Jade and believed she was not 19 as she had claimed; officers thought she looked younger and was perhaps a juvenile  (4/4/17 Tr. at 33; Ex. 9 at 3.); (2) Jade was nervous when speaking with Trooper Duckett, even though she had clearly done nothing wrong (4/4/17 Tr. at 33.); (3) Jade was on the verge of tears when she spoke with Sergeant Wilhelm (*Id.* at 35, 58.); and (4) Jade's statement that she met these three people in Texas, which was inconsistent with Ms. Glenn's statement that they all traveled from California together.  (Ex. 19 at 29-31; Ex. 9 at 3, 10.)

All of these facts – some developed within minutes of the traffic stop and some

developed while Trooper Duckettt was performing tasks related to the traffic infractions – provided the officers with a reasonable suspicion that these females were engaging in prostitution and/or sex trafficking. That reasonable suspicion simply did not ripen into probable cause to arrest during the traffic stop. Indeed, Trooper Duckett is heard on the audio of his body camera saying: "we have sex trafficking here, but if we can't get them to break, there's like not much we can do." (Ex. 9 at 20.) Thus, Trooper Duckett did exactly what a law enforcement officer should do when confronted by the situation at hand: investigate possible criminal conduct based on his reasonable suspicion of prostitution that was developed during the traffic stop, but refrain from arresting anyone because that reasonable suspicion did not ripen into probable cause.

For the reasons stated above, the Court also finds that even if the traffic stop was prolonged beyond the time necessary to deal with the traffic infractions, the prolongation of that stop was supported by a reasonable suspicion of prostitution or sex trafficking.

## C. Invocation of the Right to Counsel

A defendant's waiver of his Miranda rights must be voluntary, knowing, and intelligent. *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998). "The prosecution bears the burden of proving by a preponderance of the evidence that a defendant knowingly and intelligently waived his Miranda rights." *Garibay*, 143 F.3d at 536. "To meet this burden, generally, the government must prove that, under the totality of circumstances, the defendant was aware of the nature of the right being abandoned and the consequence of such abandonment." *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir, 2007). "A waiver is voluntary if, under the totality of the circumstances, the confession was the product of a free and deliberate choice rather than coercion or improper inducement." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998).

The defendant claims that he invoked his right to counsel when officers returned to the truck stop and told him that he and the females were going to be detained for questioning. The defendant is not disputing that he knowingly and voluntarily waived his right to counsel before Detective Anderson interviewed him at the Sierra Vista police station. However, he

claims that his prior invocation of counsel at the truck stop requires the suppression of the subsequent statements he made to Detective Anderson.

The Court concludes that the testimony at the evidentiary hearing establishes by a preponderance of the evidence that the defendant never invoked his right to counsel, but rather, knowingly and voluntarily waived his right to counsel. Specifically, the Court finds that the testimony of both Trooper Duckett and Sergeant Wilhelm is credible and establishes that the defendant never invoked his right to counsel.

Detective Anderson testified that he read the defendant his Miranda rights from a pre-printed card that he keeps with him for interviews. (4/4/17 Tr. at 66.) Detective Anderson read the warnings on that card verbatim to the Court during his testimony. He testified that the defendant stated that he understood his rights and said he was willing to talk "as long as I'm not being arrested."[11] (*Id*. at 67.) Detective Anderson described the conversation with the defendant as "casual" and "conversational" and the tone of the interview never changed. (*Id*. at 67, 73.) During the interview, the defendant never invoked his right to counsel, never asked to end the interview, and never said that he told another officer that he did not want to talk without an attorney present. (*Id*. at 79, 84.) In fact, the defendant said that if he had anything to hide he would have already asked for a lawyer. (*Id*. at 80.) Finally, Detective Anderson was never told by the patrol officers that the defendant had previously requested counsel. (*Id*. at 72.)

Sergeant Wilhelm testified that when he returned to the truck stop and encountered the defendant and the females, none of these four people requested an attorney. (*Id*. at 90.) While Trooper Duckett was speaking with Jade, Sergeant Wilhelm spoke briefly with the defendant and the two females at the truck stop. He then transported the defendant to the

---

[11]  Defense counsel questioned Detective Anderson about whether he attempted "to clarify" the defendant's statement that he would speak as long as he was not being arrested. (*Id.* at 82-83.) Detective Anderson testified that he did not follow up on the defendant's statement. (*Id*. at 83.) But, again, the defense is not challenging the legality of the waiver of Miranda rights before Detective Anderson's interview. Rather, the defense's only argument is that the defendant invoked his rights at the truck stop and that prior invocation should have been honored by Detective Anderson.

- 23 -

DPS station in Sierra Vista. (*Id.*) During the drive to the station, as well as during every interaction that Sergeant Wilhelm had with the defendant, he never stated that he wanted to have an attorney prior to any questioning. (*Id.* at 91-92.)

The defendant testified that when the three officers arrived at the truck stop, Trooper Duckett got out of his car and grabbed Jade (the juvenile) and walked her to Trooper Duckett's patrol car. (*Id.* at 114.) Sergeant Galarneau grabbed Dana (Glenn) and told them all that they were being detained for questioning. (*Id.*) Mr. Terry testified that he told Sergeant Wilhelm: "I don't want to be questioned, I want a lawyer." (*Id.*)[12] According to Mr. Terry, Sergeant Wilhelm did not respond. (*Id.*) The defendant testified that the other two females also asked for an attorney. (*Id.* at 118.)

In light of the testimony of the law enforcement officers who interacted with the defendant on June 8, 2016, the Court finds that the defendant's testimony that he requested counsel is not credible. Sergeant Wilhelm testified that neither the defendant nor the two females invoked their right to counsel at the truck stop, or at any time thereafter. (*Id.* at 90-92.) Trooper Duckett also testified that the defendant and the two females were cooperative and no one requested an attorney. (*Id.* at 40-41.) Additionally, Ms. Glenn never testified that she and/or the defendant requested an attorney when officers came back to the truck stop.

None of the patrol officers told Detective Anderson that the defendant and/or the two females requested counsel. (*Id.* at 72.) Moreover, the defendant never asked for counsel during his interview with Detective Anderson or claimed during that interview that he told the other officers that he wanted an attorney. Finally, the defendant volunteered that if he had anything to hide he would have already asked for a lawyer. (*Id.* at 80.) The defendant simply would not have volunteered this information if he truly had previously requested an attorney. All of this testimony undercuts the defendant's credibility and claim that he invoked his right to counsel at the truck stop.

---

[12] On direct examination, the defendant testified that he was the first person to ask for an attorney. (*Id.* at 114.) On cross-examination, he first testified that he and the two females simultaneously requested an attorney, but then testified that he was the first person to request an attorney. (*Id.* at 120.)

The Court concludes that the testimony presented at the evidentiary hearing establishes by a preponderance of the evidence that the defendant never invoked his right to counsel, but rather, knowingly and voluntarily waived his right to counsel. Accordingly, it is recommended that the motion to suppress the defendant's statements be denied.

Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have fourteen (14) days from the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. Any objections and Responses to objections filed should be filed as CR 16-01350-TUC-CKJ. No Replies shall be filed unless leave is granted from the District Court.

DATED this 20th day of April, 2017.

Eric J. Markovich
United States Magistrate Judge