IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | |
| Plaintiff, ) | |
| ) | No. CR 16-1350-TUC-CKJ (EJM) |
| vs. ) | |
| ) | |
| Derek Lamont Terry, ) | **ORDER** |
| ) | |
| Defendant. ) | |

On April 20, 2017, Magistrate Judge Eric J. Markovich issued a Report and Recommendation ("R & R") (Doc. 225) in which he recommended that the Motion to Suppress Statements and the Results of the Government's Search of his Cellular Telephone (Doc. 103) filed by Derek Lamont Terry ("Terry") be denied. Terry has filed an objection (Doc. 230) and the government has filed a response (Doc. 238). Additionally, the magistrate judge discussed and made recommendations regarding the issues raised in the Motion to Suppress Evidence Seized Following Illegal Traffic Stop (Doc. 125) filed by co-defendant Dana Renaye Glenn ("Glenn"). As Terry joined in this motion (Doc. 153), the magistrate judge discussed the issues therein, and the parties address these issues in the filings, the Court accepts the R & R as also making recommendations as to those issues; the Court also accepts Terry's objections as to those issues.

The Court has reviewed the Motion to Suppress Defendant's Statements and the Results of the Government's Search of his Cellular Telephone (Doc. 103), the response (Doc. 129), the Motion to Suppress Evidence Seized Following Illegal Traffic Stop (Doc. 125), the response (Doc. 151) the Joinder (Doc. 153), the Government's Summation Re: Motion

to Suppress Hearing April 4, 2017 (Doc. 224), the R & R (Doc. 225), the exhibits, the transcript of the hearing held before the magistrate judge (Doc. 220), the objection (Doc. 230), and the response (Doc. 238).

The standard of review that is applied to a magistrate judge's report and recommendation is dependent upon whether a party files objections – the Court need not review portions of a report to which a party does not object. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). However, the Court must "determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instruction." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

*Report and Recommendation – Factual Background*

Terry points out the R & R fails to include any reference to the dash camera video and argues the dash camera video is the best objective evidence to review the stop of Terry. However, the magistrate judge included multiple references to the dash camera in his factual summary. Indeed, the magistrate judge summarized what the video and audio recordings showed. *See* R & R, pp. 4-5.

Terry further argues that "[a] review of the dash cam shows Ms. Glenn traveling in the median lane with two large semi-trucks several hundred yards in front of her and virtually out of range from the dash cam video." Objection, pp. 1-2. The Court disagrees with Terry's summary. The beginning of the dash camera video shows a black Toyota Camry passing two semi-trailer trucks, then pulling over to the side of the road. Furthermore, the testimony of Trooper [Keith Duckett ("Trooper Duckett")] indicates he observed a black Toyota Camry following a "tractor-trailer, 18 wheeler . . . at a distance of approximately one second behind the commercial vehicle[,]" while the NHTSA standard requires four to five seconds." TR

p. 17.[1] Trooper Duckett made this observation while his vehicle was parked perpendicular to the road and traffic. The dash camera video was only activated after the trooper waited for traffic to clear, pulled out onto the interstate from the side of the road, and initiated the lights of the patrol vehicle; Trooper Duckett testified that when he initiated his lights, the dash camera beeped at him, so he knew it was turned on. TR, p. 20. In other words, Terry's argument that, if Trooper Duckett was credible, the dash camera footage would show Glenn following as closely as the trooper's testimony indicated, is not well-taken. In light of when the dash camera video began, the testimony as to how closely Glenn was following the semi-trailer truck while Trooper Duckett was parked perpendicular to the traffic cannot be confirmed or contradicted by the dash camera video.

Terry objects to the R & R's description of the clothing worn by the females in the vehicle: Terry asserts "the body/dash cam [video] does not reveal clothing one would think indicative of prostitution or uncomfortable in anyway." Objection, p. 3. The Court's review of the dash camera video, however, belies this assertion. The clothing worn by at least two of the women (and arguably the third) could fairly be said to be indicative of prostitution, especially in light of the time of day during which the articles of clothing were being worn. Further, the Court agrees with the magistrate judge that the females were not dressed in comfortable clothing for the lengthy road trip.

Terry also disputes the magistrate judge's statement recognizing that Jade appeared nervous to Trooper Duckett and that Sergeant Joshua Wilhem ("Sergeant Wilhelm") told Trooper Duckett that Jade was on the verge of tears when speaking with Sergeant Wilhelm. Terry asserts the body camera video shows otherwise. The Court's review of the body camera footage leads to a conclusion that, although it could simply have been because of the law enforcement contact, it was reasonable for the trooper to conclude Jade appeared nervous. Indeed, during the encounter with Trooper Duckett, Jade did not dispute the

---

[1] The Court takes judicial notice of the fact that NHTSA is an acronym for the National Highway Traffic Safety Administration. *See* https://www.nhtsa.gov/.

trooper's statements that she was shaking and that she appeared nervous. The Court does not have any basis to conclude the officers were not truthfully summarizing their opinions of what they observed. The Court adopts this portion of the R & R.

Terry objects to legal conclusions based on factual findings reached by the magistrate judge, but makes no further specific objections to the factual summary included in the RR. The Court adopts the factual summary included in the R & R.

*Initial Stop – Reasonable Suspicion*

Terry argues the dash camera video does not support the magistrate judge's conclusion that the initial traffic stop was lawful. Rather, Terry asserts, that "[c]ommon sense and knowledge of the ways of the world demonstrate that if [] Glenn was following as closely as Trooper Duckett indicated, his dash cam would have captured images of [] Glenn following too closely." Objection, p. 2. However, the Court has concluded that the dash camera neither confirms nor contradicts the assertion by Trooper Duckett that the Toyota Camry was following the semi-trailer truck too closely when it passed his location when he was parked perpendicular to the traffic.

The magistrate judge recognized that the testimony of Trooper Duckett was contradicted by Glenn. Glenn testified she was not speeding, was traveling two car lengths behind the semi-trailer truck, and she was driving carefully through the construction zone. However, Glenn conceded she has never had a driver's license, has never applied for a driver's license and she has never taken a road test or a driving course. Glenn also admitted that she had lied to Trooper Duckett. Additionally, she acknowledged she engaged in "three way" phone calls, which are prohibited by the detention facility, with Terry and discussed the facts of this case many times with him.

This Court agrees with the conclusions of the magistrate judge. Trooper Duckett's testimony is credible. He was in a position to focus on the traffic and was in a position to observe traffic infractions. While a driver may not be knowledgeable about all traffic laws or could be distracted, the trooper was in a position to best assess if a traffic violation

- 4 -

occurred.

Additionally, when Trooper Duckett informed Glenn why she was being stopped, she did not dispute the trooper's assertion that she had been following too closely. In fact, it is more likely that, when Glenn noticed Trooper Duckett in the construction zone, her focus was on the speed of the vehicle. Additionally, the Court agrees with the summary of the magistrate judge assessing the credibility of Glenn:

> Finally, Ms. Glenn's credibility is also undercut by the following facts: (1) she has never had a driver's license; (2) she has never taken a road test or driving course where she would learn what is a safe distance between vehicles; (3) she gave Trooper Duckett a false name so he would not find out she did not have a driver's license; (4) she testified that she could not recall what direction she was traveling on June 8, 2016; and (5) she admitted that she has spoken with the defendant – in a manner that violates prison policy – more times than she can count about the pending case.

R & R, p. 15 (citing TR at 98, 101-102, 106-108).

The Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). "A police-initiated traffic stop is reasonable under the Fourth Amendment if the police stop the vehicle because of a 'reasonable suspicion' that the vehicle's occupants have broken a law." *United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006); *see also United States v. Valdes–Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc). An officer making a traffic stop must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, — U.S. —, 134 S.Ct. 1683, 1687 (2014); *see also United States v. Cortez*, 449 U.S. 411, 417–18 (1981). The Supreme Court has stated:

> The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The standard takes into account "the totality of the circumstances – the whole picture." *Cortez, supra*, at 417, 101 S.Ct. 690. Although a mere "hunch" does not create reasonable suspicion, [*Terry v. Ohio*, 392 U.S. 1, 27 (1968)], the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the

evidence," and "obviously less" than is necessary for probable cause, *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

*Navarette v. California*, 134 S. Ct. at 1687.

The reasonable suspicion standard is "somewhat abstract[,]" and courts are to give "due weight" to the factual inferences drawn by law enforcement officers. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *see also Hartz*, 458 F.3d at 1017 ("Reasonable suspicion exists if 'specific, articulable facts ... together with objective and reasonable inferences' suggest that the persons detained by the police are engaged in criminal activity.") (quoting *United States v. Lopez–Soto*, 205 F.3d at 1101, 1105). Additionally, consideration of the totality of circumstances precludes a "divide-and-conquer analysis." *United States v. Rogers*, 656 F.3d 1023, 1026-27 (2011). Moreover, even if a stop was pretextual, the reasonable suspicion raised by the traffic violation justifies the stop. *Whren,* 517 U.S. at 813, *United States v. Willis*, 431 F.3d 709, 715 (2005).

In this case, Trooper Duckett was clearly looking for traffic violations in the construction zone. He believed the vehicle had a single occupant, and that it was a rental car from California, which are indicators that law enforcement look for. The fact the trooper believed there was only one occupant in the vehicle supports his testimony that he was focusing on the vehicle.[2] Further, Trooper Duckett observed the vehicle following the semi-trailer truck too closely. Lastly, as discussed, the facts of the incident lead to a conclusion that Glenn's contradictory testimony is not credible. Therefore, the Court concludes Trooper Duckett's testimony as to the traffic violation provides a reasonable suspicion to stop the Toyota driven by Glenn. The Court adopts this portion of the RR.

*Duration of the Traffic Stop*

Terry argues that the prolonged traffic stop was not justified by reasonable suspicion. He asserts Trooper Duckett had no more than a hunch. Indeed, when Sergeant Wilhelm

---

[2]Trooper Duckett testified that, as he got out of his vehicle to approach the Toyota he saw three other people moving in the vehicle.

- 6 -

arrived (prior to the search), Trooper Duckett told him he thought they were prostitutes; Trooper Duckett testified that this was a hunch. TR, p. 51. Trooper Duckett also testified that, if at least one of the occupants had a driver's license, he would have let them drive away. However, Terry asserts the trooper quickly learned no one possessed a driver's license or possessed a driver's license that was not suspended. Terry argues that, since the occupants admitted they did not have a valid license, there was no point in prolonging the traffic stop to confirm the information electronically.

The magistrate judge summarized as follows:

> In the case at hand, the Court finds that neither Trooper Duckett nor any of the other officers at the scene of the traffic stop prolonged that stop beyond the time reasonably required to complete the mission of issuing warning tickets to Ms. Glenn. The officers' actions were aimed at: (1) addressing the traffic infraction that was the purpose of the stop, following too closely; (2) addressing another traffic infraction discovered after the vehicle was stopped, driving without a license; and (3) attending to related safety concerns. The actions of these officers lasted no longer than necessary to effectuate the purpose of the stop and the traffic violations.
>
> There is no dispute that the duration of this traffic stop was lengthy - it took around 45 minutes before the vehicle's occupants were dropped off at the truck stop. But there is no "hard and fast limit" for gauging the reasonableness of the length of detention. *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (no rigid time limitation on Terry stops as the inquiry must focus on the law enforcement purposes to be served by the stop and the time reasonably necessary to effectuate those purposes); *United States v. Mayo*, 394 F.3d 1271, 1275-1276 (9th Cir. 2005) (40-minute Terry detention was not unreasonable because officers pursued multiple inquiries promptly as they arose). Moreover, as discussed below, the occupants of the vehicle extended the duration of the traffic stop, not the law enforcement officers. *See Sharpe*, 470 U.S. at 688 (length of stop not unreasonable where officers acted diligently and suspect's actions contributed to the delay about which he complains).

R & R, pp. 16-17.

The magistrate judge also discussed that delay occurred because Glenn had originally told the trooper she had a valid licence but did not have it with her, Glenn could not recall her social security number, and the license in the name of Glenn's sister was expired. Further delay occurred because Trooper Duckett then attempted to confirm if anyone else in the vehicle had a valid license. Although Terry argues the trooper should have just accepted the statements of the occupants, these unrelated checks were necessary to determine if the trooper could permit the vehicle to leave with one of the other occupants operating the vehicle safely and responsible. *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (in

addition to deciding whether to issue a traffic citation, an officer may conduct inquiries incident to the traffic stop, such as checking the driver's license, determining if there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance). For example, "Trooper Duckett's questioning of Jade was brief and it included obtaining biographical information so he could run a computer check to verify her identity, including whether she had a driver's license." R & R, p. 19. As Trooper Duckett testified, "he simply could not let someone drive a vehicle if s/he did not have a valid license. [TR at 43-44, 52.]" R & R, pp. 18. Additionally, as discussed by the magistrate judge, delay (including a consensual search for the rental contract and then arranging for a tow of the vehicle) also occurred because the occupants did not have the rental contract for the vehicle. Further, as stated by the magistrate judge:

> Moreover, even if someone had a valid license, Trooper Duckett could not lawfully let that person drive the car unless they were an authorized driver on the rental contract. [TR at 44.] As such, he had to call for assistance from other officers to ultimately transport these four people to a safe place, rather than leave them on the side of the road. (Ex. 9 at 14, 18.) That call for assistance caused some additional, but reasonable, delay. In short, every action that Trooper Duckett took during the traffic stop served "the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 135 S.Ct. at 1615. Morever, his actions also ensured the safety of the car's occupants.

R & R, p. 19.

The Court agrees with the summary and conclusions reached by the magistrate judge. Indeed, as pointed out by the magistrate judge, the "body camera video and audio demonstrate that Trooper Duckett was working diligently in trying to locate Ms. Glenn's license information, but it did take some time to find it." R & R, p. 17. The stop was not prolonged "beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (the seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop"); *Liberal v. Estrada*, 632 F.3d 1064, 1080–81 (9th Cir. 2011) (In evaluating the reasonableness of the length of detention after an investigatory stop, a court is to consider: (a) whether the police were acting in a swiftly developing situation, (b) whether suspect's actions contributed to the added delay, and (c)

whether, in attempting to confirm or dispel his suspicions of illegal activity, officer used threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics.). The Court adopts this portion of the R & R.

Additionally, Trooper Duckett and Sergeant Wilhelm had reasonable suspicion of prostitution and/or sex trafficking. This alone justified prolonging the traffic stop. *See United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015). ("an officer may [lawfully] prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion"). As summarized by the magistrate judge:

> Both Trooper Duckett and Sergeant Wilhelm suspected, rather quickly, that the females were prostitutes. (4/4/17 Tr. at 34-35, 51, 55; Ex. 9 at 3.) Their initial suspicions were based on the following information obtained within minutes of the traffic stop: (1) none of the females had identification (or purses), which the officers testified was unusual (especially for the driver) for a long road trip between California and Texas. (Ex. 19 at 27-28.); (2) no one in the vehicle had rented it or had a rental contract or valid driver's license (4/4/17 Tr. at 28; Ex. 9 at 7-8; Ex. 19 at 3, 27.); (3) the females only knew each other by their nicknames, which Trooper Duckett testified was indicative of a criminal enterprise where the participants conceal their true names from each other (4/4/17 Tr. at 29; Ex. 9 at 3; Ex. 19 at 10.); (4) Ms. Glenn did not know her Social Security number, which seemed odd to Trooper Duckett (4/4/17 Tr. at 29; Ex. 19 at 9.); (5) the females were not wearing comfortable travel clothes for a long road trip; and (6) the inconsistent statements from the defendant and Ms. Glenn about why they went to Texas (to party or attend a funeral) and where they stayed while in Texas (in a hotel near the airport or at Ms. Glenn's aunt's house). (Ex. 9 at 4-7; Ex. 19 at 4-6, 11, 15.)

R & R, pp. 20-21. Indeed, as discussed by the magistrate judge, this suspicion only increased after the consensual search.

The magistrate judge also summarized the facts supporting the officers' suspicion of sex trafficking:

> The officer's suspicion that Jade was a juvenile involved in sex trafficking was based on the following facts: (1) officers could not find an identification record for the name provided by Jade and believed she was not 19 as she had claimed; officers thought she looked younger and was perhaps a juvenile (4/4/17 Tr. at 33; Ex. 9 at 3.); (2) Jade was nervous when speaking with Trooper Duckett, even though she had clearly done nothing wrong (4/4/17 Tr. at 33.); (3) Jade was on the verge of tears when she spoke with Sergeant Wilhelm (*Id.* at 35, 58.); and (4) Jade's statement that she met these three people in Texas, which was inconsistent with Ms. Glenn's statement that they all traveled from California together. (Ex. 19 at 29-31; Ex. 9 at 3, 10.)

R & R, p. 20.

Because these facts support the officers' suspicions of prostitution and/or sex

trafficking, the officers were lawfully permitted to investigate the offenses. That the investigation did not result in probable cause during the traffic stop explains why the officers did not arrest anyone at that time. However, this does not affect the conclusion the officers had reasonable suspicion to suspect that, in addition to the traffic violation, one or more of the occupants were involved in criminal activity. The Court adopts this portion of the R & R.

*Right to Counsel*

Terry asserts that he testified that he requested an attorney and that it is convenient that no body camera was working at that time to confirm he invoked his right to counsel. The magistrate judge summarized the testimony regarding this issue:

> Detective Anderson testified that he read the defendant his Miranda rights from a preprinted card that he keeps with him for interviews. (4/4/17 Tr. at 66.) Detective Anderson read the warnings on that card verbatim to the Court during his testimony. He testified that the defendant stated that he understood his rights and said he was willing to talk "a long as I'm not being arrested."[] (*Id.* at 67.) Detective Anderson described the conversation with the defendant as "casual" and "conversational" and the tone of the interview never changed. (*Id.* at 67, 73.) During the interview, the defendant never invoked his right to counsel, never asked to end the interview, and never said that he told another officer that he did not want to talk without an attorney present. (*Id.* at 79, 84.) In fact, the defendant said that if he had anything to hide he would have already asked for a lawyer. (*Id.* at 80.) Finally, Detective Anderson was never told by the patrol officers that the defendant had previously requested counsel. (*Id.* at 72.)
>
> Sergeant Wilhelm testified that when he returned to the truck stop and encountered the defendant and the females, none of these four people requested an attorney. (*Id.* at 90.) While Trooper Duckett was speaking with Jade, Sergeant Wilhelm spoke briefly with the defendant and the two females at the truck stop. He then transported the defendant to the DPS station in Sierra Vista. (*Id.*) During the drive to the station, as well as during every interaction that Sergeant Wilhelm had with the defendant, he never stated that he wanted to have an attorney prior to any questioning. (*Id.* at 91-92.)
>
> The defendant testified that when the three officers arrived at the truck stop, Trooper Duckett got out of his car and grabbed Jade (the juvenile) and walked her to Trooper Duckett's patrol car. (*Id.* at 114.) Sergeant Galarneau grabbed Dana (Glenn) and told them all that they were being detained for questioning. (*Id.*) Mr. Terry testified that he told Sergeant Wilhelm: "I don't want to be questioned, I want a lawyer." (*Id.*)[12] According to Mr. Terry, Sergeant Wilhelm did not respond. (*Id.*) The defendant testified that the other two females also asked for an attorney. (*Id.* at 118.)
>
> ---
> [12]On direct examination, the defendant testified that he was the first person to ask for an attorney. (*Id.* at 114.) On cross-examination, he first testified that

- 10 -

> he and the two females simultaneously requested an attorney, but then testified that he was the first person to request an attorney. (*Id.* at 120.)

R & R, pp. 23-24 (fn 11 omitted).

A custodial suspect's post-arrest statements given in response to interrogation are only admissible in the government's case-in-chief if the statements are given after a knowing and intelligent waiver of the suspect's Miranda rights. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (citations omitted) ("For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's 'waiver of Miranda rights must be voluntary, knowing, and intelligent.'"). The burden is on the government to show that Miranda rights were administered and that the defendant agreed to waive them. *Miranda*, 384 U.S. at 475. Proof of waiver must be by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

The Court finds the evidence establishes by a preponderance of the evidence that Terry did not invoke his right to counsel at the truck stop. Terry's testimony regarding his invocation was not consistent. Initially he testified he was the first person to request an attorney, then stated he and two females simultaneously requested an attorney, but then stated he was the first to request counsel. More importantly, the officers consistently stated Terry did not invoke his right to counsel at the truck stop. This is consistent with Terry's statements during the interview with Detective Anderson. Terry did not request counsel during that interview and specifically stated that, if he had anything to hide, he would have already asked for an attorney.

Additionally, the Court does not find the absence of body camera footage to undercut these findings. Trooper Duckett testified the body camera stopped while he was still working on paperwork and that he does not know why it stopped. Whether it ran out of space, time, or power, for example, does not affect the testimony presented at the hearing which establishes by a preponderance of evidence that Terry did not request an attorney and that he waived his *Miranda* rights knowingly, voluntarily, and intelligently. *Garibay*, 143 F.3d

at 536. The Court adopts this portion of the R & R.

Accordingly, IT IS ORDERED:

1. The Report and Recommendation (Doc. 225) is ADOPTED.
2. The Motion to Suppress (Doc. 103) is DENIED.
3. The Motion to Suppress Evidence Seized Following Illegal Traffic Stop (Doc. 125), as joined by Terry (Doc. 153) is DENIED.

Dated this 31st day of May, 2017.

_____
Cindy K. Jorgenson
United States District Judge